866 So.2d 41 (2004)
THE FLORIDA BAR, Complainant,
v.
Jeanette Elizabeth SMITH, Respondent.
No. SC02-111.
Supreme Court of Florida.
January 22, 2004.
*42 John F. Harkness, Jr., Executive Director, and John Anthony Boggs, Staff Counsel, Tallahassee, FL; and Carlos Alberto Leon, Bar Counsel, Miami, FL, for Complainant.
Richard B. Marx of Richard B. Marx & Associates, Miami, FL, for Respondent.
PER CURIAM.
We have for review a referee's report regarding alleged ethical breaches by Jeanette Elizabeth Smith. We have jurisdiction. See art. V, § 15, Fla. Const.
The Florida Bar filed a three-count disciplinary complaint against Smith alleging that she violated numerous Rules Regulating the Florida Bar by negligently handling two Immigration and Naturalization Service (INS) matters, engaging in improper trust accounting practices, and demonstrating a lack of financial responsibility.

I. FACTS
After a hearing, the referee issued a report in which she made the following findings and recommendations:
Smith is a sole practitioner whose primary practice consists of immigration and entertainment matters. She devotes her practice to helping society's less fortunate members. Witnesses testified regarding Smith's selfless dedication to helping the indigent and vulnerable. Also, witnesses praised her integrity and stated that she is "not interested in making money."
Beginning in the late summer and fall of 1999, Smith suffered from several medical problems. Due to low blood pressure, dehydration, *43 and exhaustion, she eventually collapsed and required emergency treatment twice in March and August, 2000, and was repeatedly on bed rest and intravenous fluids for several weeks at a time. During this period she experienced dizziness and disorientation and became progressively weaker. In December 2000, she suffered another medical crisis while pregnant. After Smith was taken to an emergency room in extreme pain, doctors determined that the fetus had been dead for several weeks. Doctors gave Smith medication to induce labor and to avoid a surgical abortion, but she subsequently hemorrhaged and underwent an emergency procedure in January 2001. Smith admitted that she was not making the best decisions during this period.
Count I. Smith was retained to represent Mr. and Mrs. Munim in an immigration matter. The Munims provided all the necessary documents and completed payment in the amount of $4500 to Smith by November 16, 1999. Later that November, Smith requested an additional payment of $1665 for the "residency filing fees" that were required with submission of the labor certification packet. The Munims paid this additional amount on November 29, 1999.
On December 1, 1999, Smith deposited the Munims' $1665 check into her operating account rather than her trust account. She did not offer a valid explanation for depositing the filing fees in the operating account. Further, as of January 13, 2000, the balance in Smith's operating account was $1,766.25 short to cover her obligation for the Munims.
On January 13, 2000, Smith sent the Munims a fax stating that their package would be submitted to the INS that day. Smith gave the completed packet to her sister, who was acting as her secretary at the time, for mailing. Smith did not send the package as "return receipt."
Once or twice per week, the Munims contacted Smith's office requesting copies of the completed forms and material submitted to INS. They never received any of the requested proof of filing, nor does any appear to exist. Despite their frequent requests, it was not until April 2000 that Smith's office began researching the bank records to determine whether INS had submitted any of the checks for payment. Eventually, in May, Smith told the Munims that they would have to repay the filing fee and resubmit all documents.
In response, the Munims decided to resubmit their labor certification package to INS on their own. In order to complete this process, they had to borrow money for the filing fees and incurred additional costs associated with procuring new medical examinations, photographs, and notary services. These costs totaled $2997. The Munims orally requested that Smith refund their filing fee. They repeated this request in letters to Smith dated June 12 and 23, 2000. Smith did not communicate with them until July 11, 2000. Eventually, in October, 2000, Smith reimbursed the Munims $1665 for the filing fees.
As to Count I, the referee recommended that Smith be found guilty of violating rules 3-4.3 (misconduct); 4-1.3 (diligence); 4-1.4(a) (communication with client); 4-1.15(a)(2002) (client funds to be held in trust); 4-8.4(a) (a lawyer shall not violate or attempt to violate the Rules of Professional Conduct); 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 5-1.1(a) (a lawyer shall hold a client's funds in trust, separate from the lawyer's own property).
Count II. Mr. Kebbab hired Smith to represent him in an immigration matter in October 2000. Kebbab was a permanent *44 resident whose status would expire on December 30, 2000. He sought a change of status because he had married an American citizen. Time was of the essence because of the impending deadline and because Kebbab wanted to travel outside the U.S. to attend his sister's wedding in August 2001.
For many months, Smith failed to communicate with Kebbab regarding the status of his case. Eventually, in the spring or summer of 2001, Kebbab went to the INS and found no record that his case had ever been filed. He began calling Smith's office several times a day because his status had been changed to illegal and he also needed to travel to the wedding. Further, he was laid off from work but was not eligible for unemployment benefits due to his expired status. Financially unable to hire another lawyer, Kebbab was dependent on Smith to conclude his case, which she ultimately did, and he obtained his green card.
As to Count II, the referee recommended that Smith be found guilty of violating rules 4-1.3 (diligence); 4-1.4 (communication with client); 4-1.16 (declining or terminating representation); 4-3.2 (expediting litigation); and 4-8.4(a) (a lawyer shall not violate or attempt to violate the Rules of Professional Conduct).
Count III. On August 10, 2000, Smith issued a check for $100 to satisfy a bill from her phone answering service. The check was returned for insufficient funds twice. Smith ultimately repaid the $100 to the answering company. However, Smith was not able to arrange a payment plan for the additional service charges of $112.50. Smith's description of her difficulties working with the company to pay the additional service charges was corroborated by the Bar's investigator, who also found it difficult working with the complaining company. Therefore, the referee found that no particular significance should attach for Smith's failure to pay the additional service charges. However, for writing the check that was returned, the referee recommended that Smith be found guilty of violating rule 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).
In considering a disciplinary recommendation, the referee found the aggravating factors of (1) pattern of misconduct and (2) multiple offenses. Further, the referee found that Smith exhibited a pattern of excuse-making and blame-shifting which suggested that these types of transgressions could happen again unless there was specific training and supervision by more experienced lawyers or mentors. In mitigation, the referee found (1) absence of a dishonest or selfish motive; (2) Smith's lack of financial motivation contributed to her trouble keeping the books; (3) good reputation; (4) physical impairment; (5) rehabilitation; and (6) remorse. Further, the referee noted that at some point Smith began running her office alone, without any support staff. The referee concluded that Smith became overwhelmed due to a combination of medical problems, financial struggle, and overwork. Therefore, the referee concluded that Smith's financial mismanagement was the product of extraordinary sloppiness and culpable negligence, rather than a truly nefarious intent. Further, Smith had taken the following remedial steps: (1) she offered to refund the Munims for the last part of the certification process; (2) she voluntarily attended the Professionalism Seminar required for new lawyers; (3) she contacted The Florida Bar's Law Office Management Assistance Service (LOMAS), although she was unable to have them come to her office for financial reasons; (4) she contacted Florida Lawyer's Assistance for stress therapy; and (5) Smith began monitoring *45 her blood pressure to minimize any relapse of her health problems.
As to discipline, the referee recommended that Smith be suspended for two years, followed by two years of probation with the following conditions: (1) Smith should obtain the services of LOMAS and her accounts should be subject to quarterly audits; (2) she should be required to certify her good health and fitness to practice quarterly with documentation by her physician; (3) Smith should obtain a mentor attorney (or one should be appointed for her) to monitor her caseload and disposition of cases quarterly; and (4) she should pay restitution to the Munims in the amount of $2997. The referee awarded costs of the proceeding to the Bar, which total $1150.
Smith petitioned this Court for review. Her challenges raise the following issues: (1) whether the referee's findings of fact are clearly erroneous; (2) whether the referee's findings of fact support her recommendation that Smith violated rule 4-8.4(c); (3) whether the referee's finding of two aggravating factors is clearly erroneous or lacking in evidentiary support; (4) whether the referee's disciplinary recommendation of a two-year suspension has a reasonable basis of support in existing case law; and (5) whether the referee erred in recommending that Smith pay additional restitution.

II. ANALYSIS

A.
First, we consider Smith's claim that the referee's findings of fact are clearly erroneous. Smith contends that the main issue in this case is client neglect that occurred because of her illnesses. She alleges that the referee erred by focusing on her mismanagement of the trust funds, that the evidence does not support the referee's findings, and that the referee's findings did not take her illnesses into account.
If a referee's findings of fact are supported by competent, substantial evidence, this Court is precluded from reweighing the evidence and substituting its judgment for that of the referee. See Florida Bar v. Jordan, 705 So.2d 1387, 1390 (Fla.1998). The record demonstrates that Smith's misconduct was the result of substantial financial mismanagement rather than misappropriation. Therefore, the referee was correct in examining Smith's mismanagement of the client funds.
Smith admitted depositing the Munims' $1665 into her operating account instead of her trust account. She also testified about unintentionally using those funds for expenses rather than applying them towards the Munims' filing fee. Further, a Bar auditor conducted an audit of Smith's account and determined that she deposited the $1665 check into her operating account. The auditor also found that on January 13, 2000, the balance in Smith's operating account was $1,766.25 short of her obligation to the Munims. We find that the record supports the referee's findings that Smith deposited the Munims' check into her operating account and that the balance in Smith's account was insufficient to cover her financial obligations to the Munims.
We also find that the referee's factual findings demonstrate that the referee took Smith's illnesses into account. In her report, the referee outlined Smith's health problems that began in the summer of 1999 and extended to January 2001, when she had the emergency surgery related to her deceased fetus. The referee also repeatedly referred to Smith's health problems and even considered them as mitigating factors. We conclude that the referee's findings of fact *46 are supported by competent, substantial evidence.

B.
The referee recommended that Smith be found guilty of two violations of rule 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) for her mismanagement of the Munims' funds and for writing the worthless $100 check to her phone answering service. Smith asserts that because her financial misconduct was the result of extraordinary sloppiness and negligence, the referee's findings do not support the referee's recommendations that Smith violated rule 4-8.4(c). Smith claims the record does not demonstrate that she had the intent necessary to result in violations of the rule.
Smith is correct that the element of intent must be shown to find a violation of rule 4-8.4(c). However, in Florida Bar v. Fredericks, 731 So.2d 1249 (Fla.1999), this Court stated that "in order to satisfy the element of intent it must only be shown that the conduct was deliberate or knowing." Id. at 1252. See also Florida Bar v. Barley, 831 So.2d 163, 169 (Fla.2002). In Fredericks, this Court noted that the motive behind the attorney's action was not the determinative factor. Rather, the issue was whether the attorney deliberately or knowingly engaged in the activity in question. In the instant case, Smith deposited the Munims' check into her operating account, rather than her trust account, and spent the funds on unrelated expenses. Smith was unable to offer a valid explanation for her actions. Further, in January 2000, a month after she deposited the check, the balance in her operating account was still over $1700 short to cover her obligation to the Munims. We find that Smith's misconduct regarding the Munims' funds was deliberate or knowing, and approve the referee's recommendation of this violation of rule 4-8.4(c). However, we disapprove the referee's recommendation that Smith violated the rule by writing a single worthless check to her phone answering service. We acknowledge that issuing worthless checks can result in a serious rule violation. See Florida Bar v. Kassier, 730 So.2d 1273 (Fla.1998) (issuing numerous worthless checks constituted a violation of rule 4-8.4(c)). However, considering the facts of the instant case, where Smith wrote a single check for a modest amount and there is no evidence that she knew the check would be returned, we cannot find that Smith intended to defraud the company. Therefore, Smith did not have the intent necessary to result in a violation of rule 4-8.4(c) when she wrote the check to the answering service.[1]

C.
Smith next alleges that the referee did not properly consider the facts in finding the aggravating factors. She argues that the referee's finding of a "pattern of misconduct" is not supported by the evidence because she does not have a prior disciplinary history. She also claims that the finding of "multiple offenses" is not supported because the misconduct in the instant case was an isolated incident that took place during Smith's period of illness. This Court has held that "a referee's finding as to the existence of a particular *47 aggravator is considered a factual determination and is therefore presumed correct and will be upheld unless clearly erroneous or lacking in evidentiary support." Florida Bar v. Barley, 831 So.2d 163, 170 (Fla. 2002). See also Florida Bar v. Wolis, 783 So.2d 1057 (Fla.2001).
In contrast to Smith's claim that there was no "pattern of misconduct," the record indicates that she established a pattern of neglecting her clients. Her failure to properly process the Munims' case (Count I) started in November 1999 and continued until she finally reimbursed them the filing fee in October 2000. With regard to Kebbab's case (Count II), he hired Smith in October 2000 because his immigration status would expire in late December 2000. It was not until the spring or summer of 2001, after Kebbab went to the INS and discovered that his case had never been filed and that his status had been changed to illegal, that Smith concluded his case. These two cases demonstrate that Smith's pattern of neglect extended well over one and one-half years.
Smith's claim that the record does not support the referee's finding of "multiple offenses" is without merit. The fact that the referee recommended thirteen rule violations supports the finding of this aggravating factor.
Smith has failed to show that the referee's finding of these two aggravating factors is clearly erroneous or lacking in evidentiary support.

D.
Next, we consider Smith's challenge to the referee's recommended discipline of a two-year suspension. In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because, ultimately, it is the Court's responsibility to order the appropriate sanction. See Florida Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also Art. V, § 15, Fla. Const. However, generally speaking this Court will not second-guess the referee's recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions. See Florida Bar v. Temmer, 753 So.2d 555, 558 (Fla. 1999).
It is well settled that the "misuse of client funds held in trust is one of the most serious offenses a lawyer can commit and that disbarment is presumed to be the appropriate punishment." Florida Bar v. Travis, 765 So.2d 689, 691 (Fla.2000); see also Florida Bar v. Tillman, 682 So.2d 542 (Fla.1996). However, Florida Standard for Imposing Lawyer Sanctions 4.1 states that mitigating circumstances can be taken into account. If mitigating factors indicate that disbarment is not appropriate, suspension may be considered as an appropriate sanction. See Fla. Stds. Imposing Law. Sancs 4.12; see also Florida Bar v. Mason, 826 So.2d 985 (Fla.2002); Florida Bar v. Tauler, 775 So.2d 944 (Fla.2000). For the reasons expressed below, which include substantial mitigation, we find that the referee's recommended discipline does not have a reasonable basis in existing case law.
The referee found that Smith's misconduct was not due to a dishonest or selfish motive. Rather, her lack of financial motivation contributed to her significant financial mismanagement. We agree. The record indicates that Smith's financial mismanagement was the product of extraordinary sloppiness and negligence in bookkeeping, rather than misappropriation or an intent to deceive her clients.
We have imposed a two-year suspension under more egregious circumstances. In Florida Bar v. Mason, 826 So.2d 985 (Fla. *48 2002), an attorney created trust account shortages because she engaged in over eighty transfers of funds from her trust account to her operating account. After reviewing the record, this Court found that Mason's errors were due to mistakes in accounting practices and that she was not attempting to intentionally steal from her clients. Mason received a two-year suspension. The rationale in Mason is applicable to the instant case, in which Smith's misconduct is also due to financial mismanagement. Further, in both cases the referees only found two aggravating factors, while noting similar mitigating factors: (1) the respondents had personal and emotional problems (or a physical impairment); (2) efforts were made to correct the problems; (3) the respondents were overwhelmed by or inexperienced in handling the administrative responsibilities of a law practice; (4) the respondents had good reputations; and (5) the respondents showed remorse. However, we find Smith's misconduct to be less egregious than Mason's because Smith's financial mismanagement did not rise to the level displayed in Mason.
Although Florida Bar v. Tauler, 775 So.2d 944 (Fla.2000), involved misappropriation, it provides guidance in the instant case. The mitigation in Tauler included extensive service to the indigent. Further, Tauler had diminished culpability because she suffered from extreme hardships. This Court suspended her for three years, stating that the disciplinary sanction was based on the unique mitigating circumstances present in the case, including Tauler's clear commitment to providing legal assistance to those in need.
In comparison to Tauler, Smith did not engage in misappropriation. However, as in Tauler's case, the referee here found substantial mitigation. Smith has dedicated her career to helping those less fortunate. The record indicates that Smith has "devoted all the years she has been an attorney to taking care of the indigent, the poor, the needy, [and] the downtrodden." Society could suffer for her loss during a lengthy suspension. See Florida Bar v. Lord, 433 So.2d 983, 986 (Fla.1983) (discipline for unethical conduct must be fair to society, which includes not denying the public the services of a qualified lawyer as a result of an unduly harsh sanction).
Further, Tauler and Smith both suffered from severe hardships. Tauler had an overbearing husband who had received a serious back injury, causing him to lose his surgical practice. Tauler's husband had filed for bankruptcy, and they were in the process of losing their home. Tauler was found to have "diminished culpability due to the circumstances surrounding [her] misconduct." Tauler, 775 So.2d at 947. Although this Court will not "excuse an attorney for dipping into his trust funds as a means of solving personal problems," it will recognize that judgment can be impaired so as to diminish culpability. Florida Bar v. Shanzer, 572 So.2d 1382, 1384 (Fla.1991). See also Florida Bar v. Condon, 632 So.2d 70 (Fla.1994). In comparison to Tauler, Smith suffered from various illnesses for an extensive period, Smith lost her baby, and, due to her work helping society's downtrodden instead of pursuing a more lucrative practice, she sometimes operated without a support staff. Smith became overwhelmed due to a combination of medical problems and financial struggle. We find that under these circumstances, Smith had diminished culpability. Further, because Smith did not engage in misappropriation, we find Smith's misconduct to be less egregious than Tauler's.
Smith's misconduct was due to financial mismanagement rather than misappropriation. Also, her case presents substantial mitigation, which includes her various medical problems and extensive service to *49 society's less fortunate. Further, we disapprove the referee's recommendation that Smith violated rule 4-8.4(c) by issuing one worthless check to her phone answering service. Considering these factors, we conclude case law indicates that the referee's recommended discipline does not have a reasonable basis of support. Although we are troubled by Smith's financial mismanagement and neglect of her clients, we conclude that the instant facts and case law indicate that a one-year suspension is the appropriate sanction.

E.
Finally, Smith claims the referee erred in recommending that she pay $2997 in restitution to the Munims for mishandling their INS paperwork. The Bar states that the referee's recommended amount of $2997 should be offset by the $1665 Smith already reimbursed to the Munims. The remaining amount, $1332, represents the Munims' expenses for replacing the material they submitted to INS.
Rule 3-5.1(i), Restitution, states that a referee may order restitution if a "respondent has received a clearly excessive, illegal, or prohibited fee or ... the respondent has converted trust funds or property." The purpose of Bar discipline procedures is to protect the public. See Florida Bar v. Cox, 794 So.2d 1278 (Fla. 2001). In Florida Bar v. Della-Donna, 583 So.2d 307 (Fla.1989), this Court stated that "[d]isciplinary actions cannot be used as a substitute for what should be addressed in private civil actions against attorneys. They are not intended as forums for litigating claims between attorneys and third parties.... We cannot and should not turn restitution as a condition to practicing our profession into a judgment for a third party." 583 So.2d at 312 (citations omitted). See also Florida Bar v. Neale, 384 So.2d 1264, 1265 (Fla.1980) ("The rights of clients should be zealously guarded by the bar, but care should be taken to avoid the use of disciplinary action under [the rules of ethics] as a substitute for what is essentially a malpractice action."). Pursuant to rule 3-5.1(i) and case law, this Court does not award restitution to clients unless it is related to excessive or illegal fees or theft of client funds or property. As the remaining amount of $1332 represents the Munims' expenses for replacing the material they submitted to INS, we agree with Smith that the referee improperly recommended restitution of those expenses. Therefore, we disapprove the referee's recommendation that Smith pay this additional restitution to the Munims.

CONCLUSION
We approve the referee's findings of fact and recommendations of guilt as to the violations of rules 3-4.3, 4-1.3, 4-1.4, 4-1.4(a), 4-1.15(a)(2002), 4-1.16, 4-3.2, 4-8.4(a), 4-8.4(c) (for mismanagement of the Munims' funds), and 5-1.1(a). We disapprove the referee's recommendation that Smith be found guilty of violating rule 4-8.4(c) for writing the single worthless check to her phone answering service. We approve the referee's finding of "pattern of misconduct" and "multiple offenses" as aggravating factors. Further, we disapprove the referee's recommended discipline of a two-year suspension.
Accordingly, Jeanette Elizabeth Smith is hereby suspended for one year from the practice of law in Florida. The suspension will be effective thirty days from the filing of this opinion so that Smith can close out her practice and protect the interests of existing clients. If Smith notifies this Court in writing that she is no longer practicing and does not need the thirty days to protect existing clients, this Court *50 will enter an order making the suspension effective immediately. Jeanette Elizabeth Smith shall accept no new business from the date this opinion is filed until she is reinstated.
Further, we approve the referee's disciplinary recommendation of probation for two years, including three of the conditions specified in the referee's report,[2] if Smith is reinstated to the practice of law in Florida.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida XXXXX-XXXX, for recovery of costs from Jeanette Elizabeth Smith in the amount of $1150, for which sum let execution issue.
It is so ordered.
ANSTEAD, C.J., and PARIENTE, LEWIS, and CANTERO, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which QUINCE and BELL, JJ., concur.
WELLS, J., concurring in part and dissenting in part.
I concur with the majority that Smith's misconduct regarding the Munims' funds was deliberate or knowing, and with approving the referee's recommendation regarding this violation of rule 4.84(c). I concur with disapproving the referee's recommendation that Smith violated rule 4.84(c) in respect to the worthless check.
I dissent as to the reduction of the referee's recommended discipline from two years to one year.
It is simply contradictory to hold on the one hand that Smith's taking of the Munims' money was deliberate or knowing but then on the other hand that Smith did not engage in misappropriation. It is obviously misappropriation to intentionally convert a client's money to the lawyer's own use. I do acknowledge that this referee found that this taking of money was an isolated incident.
As the majority recognizes, we have stated that "misuse of client funds held in trust is one of the most serious offenses a lawyer can commit and that disbarment is presumed to be the appropriate punishment." Florida Bar v. Travis, 765 So.2d 689, 691 (Fla.2000). We followed that statement in Travis by disbarring Travis. Travis, like Smith, had presented substantial evidence of contributions to his community and had an otherwise exemplary record. Id. at 691. Travis, also like Smith, however, had deliberately and knowingly taken money entrusted to him by clients. In Travis, this Court did note, "In cases involving isolated incidents of misappropriation, this Court has found the presumption of disbarment rebutted when mitigation such as cooperation, restitution, and the absence of a past disciplinary record exist." Id. It is on the basis of this precedent that I would approve the referee's recommendation.
I do want to state that my view, as set forth in my dissent in Florida Bar v. Tauler, 775 So.2d 944 (Fla.2000), continues to be my view when there is more than an isolated incident and a lack of strong mitigation:

*51 I do not diminish the heavy stress and pressure which respondent's personal crisis had upon her and her family. However, lawyers must know and the public must have confidence that lawyers know that funds held by lawyers in trust are as unavailable for personal use as funds which are in a bank in another person's name. Intentionally taking that money for whatever purpose is stealing, for which the consequence is certainno longer having the privilege of being a member of The Florida Bar.
I recognize that such absolutes are often tested by factual circumstances which make this imposition harsh. However, public trust and confidence in lawyers, which is a necessary foundation for public trust and confidence in the judicial system, can stand on nothing less. There simply has to be public assurance that funds entrusted to lawyers will not be stolen by the lawyer, and if that public assurance is breached by a lawyer, that lawyer will no longer be a Florida lawyer.
I must enforce this belief by stating I would disbar the respondent.
Id. at 950.
QUINCE and BELL, JJ., concur.
NOTES
[1] Neither party contests the referee's recommendations as to guilt for the violations of rules 3-4.3, 4-1.3, 4-1.4, 4-1.4(a), 4-1.15(a)(2002), 4-1.16, 4-3.2, 4-8.4(a), and 5-1.1(a). Upon review of the record, we conclude that the referee's findings of fact support these recommended rule violations. Therefore, we approve the recommendations of guilt as to these violations.
[2] We approve the referee's recommendation of the following conditions for Smith's probation: (1) she should obtain the services of LOMAS and her accounts should be subject to quarterly audits; (2) Smith should be required to certify her good health and fitness to practice quarterly with documentation by her physician; and (3) she should obtain a mentor attorney (or one should be appointed for her) to monitor her caseload and disposition of cases quarterly. As stated above, we disapprove the referee's recommendation that Smith pay additional restitution to the Munims.